THOMAS L. LEEDOM *et al.*, Appellants, v. THE J. M. WARD FURNITURE, STOVE AND CARPET COMPANY *et al.*, Respondents.

St. Louis Court of Appeals, December 24, 1889.

1, **Sufficiency of Evidence to Take Case to Jury.** Evidence examined, and *held* sufficient to warrant submission to the jury of the issues, whether a purchase of the goods in controversy was made with the intention on the part of the purchaser never to pay therefor, and whether a pledgee, claiming under such purchaser, was affected with knowledge or notice of such intent.

2, **Sales:** INSOLVENCY OF PURCHASER: EVIDENCE OF HIS INTENTION NEVER TO PAY FOR PROPERTY. Insolvency of a vendee, though known to himself, is not ordinarily proof of an intention on his part never to pay for the purchase, unless the purchase be made shortly before the vendee's failure, and with knowledge on his part that his business is hopelessly swamped, or unless there is substantial evidence of other circumstances to support the inference of such an intention.

3.  ——— : ——— : CASE OF PURCHASE BY A CORPORATION.  A corporation, organized under the laws of Missouri, is practically dead, when it suspends business owing to its insolvency; and its inability ever to pay for the purchases, if known to its agents, is tantamount to an intention on its part never to pay therefor.

4.  ——— : RIGHT OF SUB-VENDEE OF FRAUDULENT PURCHASER : BURDEN OF PROOF.  When an intention on the part of a purchaser never to pay for his purchase is shown, one who claims the property as his sub-vendee must show the payment of a valuable consideration, and good faith on his part in a general way; on such proof the burden shifts to the original vendor to show that the sub-vendee purchased with knowledge of the fraudulent intention of the original vendee, or with knowledge of facts sufficient to put a man of ordinary prudence upon inquiry as to that matter.

*Appeal from the St. Louis City Circuit Court.*—Hon. Daniel Dillon, Judge.

Reversed and remanded.

*Nathan Frank* and *James P. Dawson*, for the appellants.

*Lubke & Muench*, for the respondents.

Thompson, J., delivered the opinion of the court.

This was an action of replevin for twenty-five rolls of carpet of the value of fifteen hundred and twenty-three dollars and forty-two cents.   The action was originally brought against two defendants, the J. M. Ward Furniture, Stove and Carpet Company, a corporation, and John H. Vette.   An amended petition was filed, joining as defendants, the New York Storage Warehouse and Furniture Van Company, also a corporation. An order of delivery was obtained, under which the plaintiffs procured possession of the property from the actual custody of the warehouse company, which had issued a warehouse receipt for the same, which receipt was held by Vette.   The J. M. Ward Furniture, Stove and Carpet Company (which will hereafter be spoken

of as the furniture company) were not in custody of the goods, either actually or constructively, at the time when the suit was brought, and seem to have been improperly joined as defendants. They made no answer, and did not defend in any way. The defendants Vette and the New York Storage Warehouse and Furniture Van Company (which will be hereafter spoken of as the warehouse company) jointly answered. Their answer, after a general denial, alleges the value of the property to be sixteen hundred dollars; alleges that the property was, under the writ of replevin, taken out of the possession of the warehouse company; that the defendant Vette then held, and still holds, the company's warehouse receipt for the same, and that he is such holder for value. The defendants then pray judgment for the return of the property, etc.

The case went to trial before a jury, and at the close of plaintiffs' evidence the court instructed the jury that, upon the evidence and pleadings, the plaintiffs could not recover; that they should find for the defendants, the warehouse company and Vette, for the return of the property and nominal damages for its detention, and also state the present value of it, which could not be more than fifteen hundred and twenty-three dollars and forty-two cents. The jury returned a verdict accordingly. Judgment was entered thereon, and the plaintiffs prosecute this appeal.

The grounds, on which the plaintiffs prosecuted this action of replevin were that the J. M. Ward Furniture, Stove and Carpet Company had purchased these goods from the plaintiffs, intending never to pay for them; and that the defendant Vette, to whom the furniture company had pledged them for an advance of money, had taken them under circumstances which either affected him with knowledge, or put him upon inquiry, with respect to the fact that the furniture company had so purchased the goods, intending never to pay for them.

Two substantial questions arise, therefore, upon this record : (1) Whether there was substantial evidence tending to show that the furniture company had purchased the goods of these plaintiffs with the intent never to pay for them. (2) And, if there was such evidence, whether Vette took the goods of the furniture company with knowledge of that fact, or of circumstances sufficient to put a reasonably careful and prudent business man upon the inquiry as to that fact.

We think that there was evidence sufficient to take the question to the jury, whether the furniture company, at the time of the purchase of the goods, intended never to pay for them. The evidence tended to show that the furniture company had, for a considerable time, done business in St. Louis on what is known as the "installment plan," which consists of selling furniture, carpets, etc., at retail to householders, hotel keepers and the like, chiefly on credit, a small cash payment being made at the time of the sale of the goods, and the rest paid in monthly installments; that, while the Fifth National Bank of St. Louis was in existence, that bank had been in the habit of lending money to the furniture company upon the notes of the company, secured by the notes which it thus received from its customers for monthly installments, as collateral; that, after the failure of the Fifth National Bank, the furniture company had been in the habit of negotiating the notes received from its customers with Vette, who was a money lender, and who discounted the notes upon their being endorsed by the furniture company, much as a bank would, except that he reserved a rate of interest varying from two per cent. to three per cent. per month, the latter being his rate of discount at the time of the transaction in controversy. It appeared that the notes, which Vette thus discounted, were placed in the hands of the furniture company for collection at their maturity. The money thus collected by the furniture company, on notes which Vette had

discounted for the company, would be turned over to him. The company at the same time would each week turn over to him a new batch of paper for discount. When notes were not paid at maturity, the furniture company took them up, unless in cases where Vette elected to release the company, and look wholly to the security. The furniture company kept a book, known as a "discount book," in which it entered all the discount transactions which it had with Vette. To this book Vette had constant access. The furniture company also kept a book, in which Mr. Ward, its president, entered on the first of each month a list of the entire indebtedness of the company. About the first of November, 1888, the discount book ran out, and Vette's discount transactions were thereafter entered in the same book in which Ward made monthly entries of the indebtedness of the company, and Vette had constant access to this book. Vette was a constant visitor at the place of business of the furniture company. The capital stock of the furniture company was twenty thousand dollars. At the time when it purchased the goods of the plaintiffs, which are now in controversy, its indebtedness was probably about twenty-six thousand dollars, and its stock of goods on hand was from twenty to twenty-five thousand dollars. The furniture company habitually carried a balance in bank of from six to twelve thousand dollars. It had previously purchased goods from the plaintiffs, and had always met its payments, and at the time of this last purchase it owed the plaintiffs nothing. This purchase was ordered by letter on the twenty-fifth of October, 1888, the furniture company in the letter soliciting the usual credit. There was evidence tending to show that, when this consignment of goods was ordered, the company, to the knowledge of its managing officers, was insolvent. Fifteen days before, namely, on the tenth of October, which was its regular pay day, it had deferred its payments until the twentieth of the month,

because its officers did not think that they had sufficient funds on hand to meet the current expenses and notes coming due. It would seem from the somewhat obscure statement of Ward on this point that, on the twentieth of October, the company actually paid out about nine thousand dollars. The inability, thus disclosed, to meet its indebtedness as it fell due constitutes the legal definition of insolvency. *Toof v. Martin*, 13 Wall. (U. S) 40; *Dewey v. Trust Co.*, 56 Vt. 476; s. c., 48 Am. Rep. 803, 806; *Thompson v. Thompson*, 4 Cush. 127, 134; *Jackson v. McCulloch*, 1 Woods (U. S.) 434; *Bayly v. Schofield*, 1 Maule & S. 338; *Shone v. Lucas*, 3 Dow. & R. 218. Whether the payments made on the twentieth of October are to be regarded as restoring its solvency was at most, we think, a question for the jury, under all the evidence touching the condition of the company. The furniture company had a deed of trust on the furniture of the Hotel Richelieu, dated October 6, 1888, amounting in the aggregate to the sum of fifteen thousand dollars, broken into fifteen monthly notes of one thousand dollars each, which bore interest at the rate of ten per cent. per annum after maturity. About the fifteenth of October the furniture company turned this mortgage over to Vette for thirteen thousand dollars, in consideration of which Vette took up a note of the company for eight thousand dollars, in the Mechanic's Bank of St. Louis, and paid the company five thousand dollars in cash. In the same month of October the company had another transaction, the nature of which is not disclosed by the evidence, in which it lost ten thousand dollars.

Such being the state of the company's affairs, and such being the state of Vette's knowledge with respect to the same, when the goods in controversy arrived in St. Louis, instead of being taken into the store house of the furniture company and placed with its other goods, they were sent back to the warehouse of the St. Louis Transfer Company, the common carrier by whom they

had been tendered to the furniture company. The
reason given by Ward for not receiving the goods at
the company's usual place of business, when tendered
by the transfer company, was that the elevators were
broken. · A few days after this, namely, about the
thirteenth of November, the furniture company, having
need of money, applied to Vette through Mr. Ward, its
president, for a loan, and Vette inquired on what col-
lateral. Mr. Ward told him, on those carpets in the
warehouse of the transfer company. Mr. Vette and Mr.
Ward then went down to the transfer company's ware-
house together, to get a warehouse receipt from that
company to deliver to Vette as collateral. The transfer
company declined to issue a warehouse receipt. There-
upon Mr. Ward gave Vette an order for the goods upon
the transfer company. By means of this order Vette
caused the goods to be transferred from the warehouse
of the transfer company to the warehouse of the defend-
ant, the New York Storage Warehouse and Furniture
Van Company. This warehouse company issued a ware-
house receipt, it would seem, in favor of the furniture
company, and when this was received by the latter, it,
through Mr. Ward, executed a note for two thousand
and fifty dollars bearing ten per cent. interest from
maturity, payable to Vette, and gave him the warehouse
receipt as collateral security for the same. For this
Vette delivered to Ward for the company two thousand
dollars, not in the form of a check, but in currency.
The warehouse receipt bore date November 13, 1888, and
the transaction was either consummated on that day or
the following. When Ward thus applied to Vette for
this loan, Vette made no inquiries about the goods,
except that he asked Ward whether the goods were the
goods of the furniture company. He did not ask
whether the goods had been paid for. He did not even
call for an invoice of the goods, so far as the testimony
discloses. The invoice was at the time in the possession

of Mr. Ream, who acted as buyer for the furniture company. After the transaction with Vette was closed, and the money paid over, as it would seem, the company gave to Vette this invoice. After receiving this invoice, Vette demanded additional security, and thereupon the furniture company turned over to him some notes of one of its customers, amounting to about six hundred dollars, secured by a chattel mortgage, as additional security. This transaction, it is to be kept in mind, took place on the thirteenth or fourteenth of November. On the sixteenth and seventeenth of the same month, many creditors of the furniture company levied attachments upon its property. In no less than six of these attachments, the affidavit for attachment alleged, as one of the grounds of attachment, that the debt sued for had been fraudently contracted by the defendant. Pleas in abatement were filed by the furniture company in most of these cases, but these pleas were all afterwards withdrawn, and judgments were rendered in all these attachment suits, sustaining the attachments and for a recovery against the furniture company. These judgments aggregated more than sixteen thousand dollars.

Upon this state of evidence, we are of opinion that there was a question for the jury, whether, at the time when the furniture company ordered of the plaintiffs the goods in controversy on the twenty-fifth of October, they ordered them, intending never to pay for them. One of the rules by which this is to be tested was laid down by this court in *Elsass v. Harrington*, 28 Mo. App. 300, 305, as follows: "The purchaser must intend never to pay for them; and while many insolvent merchants take more hopeful views of their future than events justify, yet, where a merchant purchases shortly before failure, and at a time when his business is hopelessly swamped, it must, we think, be left to a jury in an action of this kind, to say whether he intended ever to pay for the goods. A knowledge on

the part of the purchaser, at the time of making the purchase, that he will not be able to pay for the goods, is tantamount to an intent not to pay for them." Reasoning thus, we held in that case that no error was committed in submitting the question to the jury. In the case with which we are now dealing, the officers of the corporation are presumed to have had knowledge of its actual condition. There was evidence tending to show that it was actually insolvent when the goods were ordered. It is true that, as a general rule, the mere fact of the insolvency of the vendee, and that he knew of the same, is not evidence to take this question to the jury,—unless the insolvency is so gross, as in the case of *Elsass v. Harrington, supra,* that evidence of *such* insolvency, known to the intending purchaser, would authorize the inference that he intended never to pay for the goods, or unless there was substantial evidence of other circumstances strengthening the inference of such fraudulent intent.

But we think that there was such evidence in this case. The fact that the regular course of business of the furniture company was to sell on monthly credits; that for nearly a year *all* of its paper received from its customers on these sales, and secured by chattel mortgages, had been discounted—not by a banker at ordinary rates—but by Vette, an outside usurer, whose rate of discount had risen from two to three per cent. a month; that, about the middle of October, 1888, the furniture company had sustained a loss of two thousand dollars, which would equal half its capital; that about the same time it had taken out of bank a series of notes aggregating fifteen thousand dollars, payable in fifteen successive monthly installments of one thousand dollars each, secured by a chattel mortgage, which were there pledged as collateral for a loan of eight thousand dollars, and had sold the same to Vette for thirteen thousand dollars, thus suffering the ruinous discount

of two thousand dollars, in order to get in five thousand dollars, more in cash—these facts, together with the evidence as to what subsequently took place respecting this very purchase, were sufficient to take to the jury the question whether the managers of the company were not, when they made this purchase, preparing to turn into money all the tangible property, they had, and could get, and then dissolve and go out of business as a corporation.

It is also to be remembered that this question is presented in a different aspect in the case of a *corporation* from that in the case of an *individual*. In a business corporation in Missouri, its capital stock and surplus, if it have any surplus, are the only resources out of which its debts can be collected; its individual share-holders are not liable to the corporation, or to its creditors, beyond making good what they have sub-scribed to its capital stock. The capital stock of this corporation, whether all paid in or not, was, at the time of this transaction, more that eaten up by its debts; nearly all the money on which it did business had for a long time been furnished by the Fifth National Bank and Vette. When a corporation suspends business by reason of insolvency, it is practically *dissolved* and *dead*, and for some purposes *legally* so. *Slee v. Bloom*, 19 Johns. 456. A corporation can, of course, have no *intent*, except the intent of its managers. In view of the foregoing considerations, a jury would be warranted in finding from the evidence that, when this purchase of goods was made, the managers of the furniture company *knew* that the company would never be able to pay for them; and this, in theory of law, is tanta-mount to an intent on the part of the corporation never to pay for them.

But the present case concerns the rights of a pledgee of the original vendee; and whether the case should have gone to the jury depends, in a measure at

least, upon the view which is taken as to the burden of proof. We apprehend that the rule in respect of the burden of proof is analogous to that which obtains in an action upon a negotiable instrument; and in such cases the rule is that where the note is shown to have been originally obtained or put in circulation by fraud or illegality, the *onus* is cast upon the holder to show that he got it for value and in good faith. *Hamilton v. Marks*, 63 Mo. 167, 180; *Johnson v. McMurry*, 72 Mo. 278, 282; *Carson v. Porter*, 22 Mo. App. 179; *Third Nat. Bank v. Tinsley*, 11 Mo. App. 498. But the holder is not obliged to prove that he had no knowledge of the specific acts which impeached the original validity of the note. When *general proof* is made by him that he received the paper before due, *bona fide* and for value, the burden of proof again shifts; it then devolves upon the maker to prove that the holder had actual notice of the specific facts which would render it originally invalid; otherwise the plaintiff must recover. *Johnson v. McMurry, supra; Carson v. Porter, supra; Third Nat. Bank v. Tinsley, supra.*

But, in respect of the last proposition, there is a difference between the case of commercial paper and that of a sub-vendee or pledgee of ordinary chattels, which may have come into the possession of his vendor or pledgor under such circumstances that a previous vendor is entitled to rescind or avoid the sale. In the latter case, the sub-vendee or pledgee is not protected by the mere *want of knowledge* of the circumstances which impeach the title of his vendor or pledgor; he will not get a good title, if there are such circumstances as would put an ordinarily prudent business man upon inquiry. Upon this subject, this court, in a case analogous to the one now before us, has distinctly approved the following instruction : "If the jury believe from the evidence that Hook [the original vendee] obtained from plaintiffs [the original vendors] any of the books

in question, by false representations of his circum-
stances, and if at the time he did not intend to pay for
the same, then no title passed from plaintiffs to Hook
which he could convey or pass to the defendant [as
here, a pledgee for value], and the plaintiffs are entitled
to recover the value of such books as the jury may find
were in defendant's possession at the time of the
demand therefor by plaintiffs,—unless the jury further
believe from the evidence that plaintiffs passed and
delivered possession of the books to Hook, and he
delivered the same into the possession of the defendant
for a valuable consideration, without any knowledge on
the part of the defendant of the fraud and misrepre-
sentations of Hook to plaintiffs, and without such facts
coming to his knowledge as would put a man of com-
mon sagacity, care and prudence on inquiry.   If the
jury, therefore, believe from the evidence that the
defendant was an innocent holder of the property for
value,—this is, having no knowledge of the fraud nor
of such facts as should have put him on inquiry,—the
verdict should be for the defendant." *Thomas v.
Freligh*, 9 Mo. App. 151, 153.  No doubt this court
intended to assimilate such a case to the well-known
rule, which applies in the case of conveyances made by
a debtor with the design to hinder, delay or defraud his
creditors.  In such a case, the law does not allow the
grantee to shut his eyes where there are circumstances
sufficient to arouse the suspicions of a man of ordinary
prudence, sagacity and caution.  "If he does so, he
fails to exercise that diligence and caution which, as
against prior creditors, are essential to give him the
character of a *bona fide* purchaser."  *State to the use v.
Estel*, 6 Mo. App. 6, 9.   See, also, *Hill v. Tissier*, 15
Mo. App. 299, 306.

In the recent case of *Price v. Lederer*, 33 Mo. App.
426, the original vendor of goods brought an action of
replevin against a sub-vendee, and recovered on a col-
lection of facts which are, in many respects, analogous

to the facts before us. The defendant admitted that his vendor purchased the goods with the intention not to pay for them, and assumed the burden of showing his own *bona fides*, so as to place himself within the category of an innocent purchaser. The jury found against him, and we were unable to set aside their verdict upon his appeal. We could not say in a case, which was fragrant with suspicion, that the jury had acted from passion or prejudice, in refusing to believe the evidence tendered by the party who had assumed the burden of proof. That case is authority for the decision of the proposition, which we now have before us, only to this extent : That a collection of facts on which we could not say, as a matter of law, that the jury had committed a manifest mistake within the meaning of the rule in *Lionberger v. Pohlman*, 16 Mo. App. 392, or had acted from passion or prejudice within the meaning of the rule in *Rosecrans v. Railroad*, 83 Mo. 678, in refusing credit to evidence, tending to show that the sub-vendee was an innocent purchaser,—would carry the question to the jury in the first instance. But that case also belongs to a catalogue of cases which illustrate the principle that, where fraud is the subject of the inquiry, the evidence must be allowed to take a wide range, and that wide latitude must be left to the triers of the fact to infer fraud from circumstances. Indeed, but for the rule which allows the trier or triers of the facts to infer fraud from circumstances, fraud would become immortal and ineradicable; for skilful persons, intending to commit fraud, are generally able to conceal the direct evidences of it. As was said by Judge HAYDEN in *State to use v. Estel*, 6 Mo. App. 10, "in the majority of cases like the present there will be no direct evidence of fraud; and the more skilful the debtor is (supposing the transfer to be fraudulent), in covering up the fraud, the less direct will be the evidence. The effort of the law is to get at the real character of the transaction, however concealed." The recent decisions of this court

in *Rainwater v. Faconesowich*, 29 Mo. App. 26, and *Desberger v. Harrington*, 28 Mo. App. 632, also illustrate this principle.   Nor is this principle at all incompatible with the opposing rule, that fraud will not be presumed without evidence; that the transactions of men are presumed to be honest, until it is otherwise made to appear, and that fraud must be affirmatively proved as a fact.   Of course, there must be reasonable evidence tending to raise the inference of fraud, in order to take the question of fraud, or no fraud, to a jury. They will not be permitted to infer fraud without evidence, and upon mere suspicion or surmise.

We conclude in the present case that, by analogy to the rule respecting commercial paper, above stated, when a state of facts was made to appear, warranting the inference that the furniture company made this purchase of goods intending not to pay for them, the burden of proof was cast upon the defendant Vette, of showing in a general way that he purchased the goods in good faith for value, and in the ordinary course of dealing; after which it would be incumbent on the plaintiffs to show a state of circumstances warranting the conclusion that he either had knowledge of the intent with which the goods were purchased by the furniture company, or knowledge of facts sufficient to put an ordinarily prudent and sagacious man upon inquiry in respect of that matter.   Of course, the plaintiff's evidence may have furnished a collection of facts relieving him from the burden of proving in a general way that he was an innocent purchaser.   But the question, in the largest sense is, whether the whole collection of facts, put in evidence by the plaintiffs, would have rendered it not unreasonable for the jury to infer that he was not an innocent purchaser within the meaning of the rule above stated.

In solving this question, the jury would be entitled to take into consideration the fact of Vette's knowledge, or means of knowledge, of the financial condition

of the company, as disclosed by the evidence above recited. They would further be entitled to consider the fact, that the furniture company was a retail dealer in such goods as the ones which are the subject of this action, and not a manufacturer or wholesaler, and that the particular goods were presumably bought to be used in its retail trade. They would be further entitled to draw reasonable inferences from the fact, that, when the offer to pledge them was first made to Vette, they were still in the hands of a common carrier; in original packages, and had not been delivered to the furniture company. They would further be authorized to consider that this was the first instance, in which the furniture company had had occasion to offer to Vette the pledge of a consignment of goods which had just arrived from a distant vendor. They would be entitled to draw inferences from the fact that Vette made no inquiry concerning the state of the furniture company's title to the goods, beyond asking Ward if the goods belonged to the company. It would not be an unreasonable conclusion for them to draw from this circumstance, with the other surrounding facts, that Vette did not wish to know of any infirmities which might attend the title of the intending pledgor. Would it also be an unreasonable conclusion for a jury to draw, that a man in the situation of Vette, with the probable knowledge which he possessed of the financial condition of the furniture company,—with the obvious suggestion in his mind, that a retail dealer will not pledge goods, just received from a vendor, in original packages without being in a condition of extreme necessity; with the reasonable inference in his mind that a dealer, thus situated, has probably not been able to pay for the particular goods, but has bought them on · credit—if desirous of acting honestly and with due regard to the rights of others, would have inquired of the intending vendor whether the goods were paid for, and would

have taken pains to get explicit information of the circumstances under which they had been purchased? We think that this would not be an unreasonable conclusion.

We, therefore, hold that the court committed error in refusing to submit the question to the jury, and in directing a verdict for the defendants.

The judgment will be reversed, and the cause remanded. All the judges concur.